# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

VINCE WILLIS,          )
                               )

     Plaintiff,        )
                               )

v.                          )     Case No.: 2:18-cv-01459-SGC
                               )

KOCH AGRONOMIC SERVICES,     )
LLC,                     )
                               )

     Defendant.      )

## MEMORANDUM OPINION[1]

Plaintiff Vince Willis initiated this matter, alleging employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981. (Doc. 1). Presently pending is the motion for summary judgment as to all claims, filed by Defendant Koch Agronomic Services, LLC ("Koch"). (Doc. 34). The motion is fully briefed and ripe for adjudication. (Docs. 35-36, 43, 45). As explained below, the motion for summary judgment is due to be granted in its entirety, and Plaintiff's claims are due to be dismissed with prejudice. Accordingly, the other pending motions are due to be denied as moot. (Docs. 25, 30, 31, 42).

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 9).

# I. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.    SUMMARY JUDGMENT FACTS

Koch is headquartered in Wichita, Kansas, and markets fertilizers. (Doc. 35 at 3).[2]  On July 1, 2014, Koch bought a plant in Sylacauga, Alabama (the "Plant"), which applies chemical coatings to fertilizers and packages them for commercial sale. (*Id.* at 3; *see* Doc. 43 at 5).  Plaintiff, who is African American and has an engineering degree, began working as the Plant Manager in September 2013, before Koch acquired the Plant. (Doc. 43 at 5; Doc. 35 at 3).  Plaintiff continued working as Plant Manager after Koch's acquisition. (Doc. 43 at 5).  As Plant Manager, Plaintiff supervised five direct reports, sixty to seventy employees, and ten to fifteen contractors. (*Id.* at 5-6).

Brett Coughlin, a white Koch vice-president, was Plaintiff's manager and was responsible for transitioning the Plant to a Koch-run facility. (Doc. 43 at 5; *see* Doc. 35 at 4).  Coughlin was responsible for another plant in St. Louis, as well as eighteen terminals throughout the country. (Doc. 43 at 5).  From Koch's acquisition of the Plant until March 1, 2016, Coughlin worked on-site at the Plant to assist Plaintiff with the transition. (Doc. 35 at 4).  On March 1, 2016, Coughlin moved back to Wichita, leaving Plaintiff as the highest-ranking Koch employee at

---

[2] Following the parties' lead, this opinion uses "Wichita" as a shorthand reference to Koch's headquarters.

the Plant. (*Id.*). Coughlin reported to Shawn Kimberly—also a white male—Koch's vice-president of operations. (*Id.*; Doc. 43 at 5).

As the Plant Manager transitioning the Plant to a Koch facility, Plaintiff learned about Koch's management philosophy and expectations. (Doc. 35 at 3-4). Koch's principal expectations for Plaintiff as Plant Manager focused on leadership, and his three main responsibilities were: (1) coaching his team and helping it fulfill the Plant's mission; (2) transitioning environmental, health, and safety ("EH&S") practices to comply with Koch's standards and ensuring equipment was reliable; and (3) creating a five-year business plan setting goals for the Plant's operations, sales, safety, quality, and financial performance. (Doc. 36-1 at 28). In April 2015, Plaintiff attended a training program noting Koch expected "ten thousand percent compliance"[3] with EH&S standards and applicable laws. (*Id.* at 45). In a similar vein, Coughlin created and often used a Plant slogan: "Protect Our People; Protect Our House." (*Id.* at 29). Plaintiff understood the slogan as reminding employees to be safe, to protect co-workers in EH&S issues, and to comply with the law. (*Id.* at 29).

Also working at the Plant was Jeff Ogle, a senior operations manager. (Doc. 43 at 6). Ogle, who is white, reported directly to Coughlin, not Plaintiff. (*Id.*). Ogle's primary responsibility was project management and replacing/installing

---

[3] 10,000% is derived from Koch's expectation that 100% of employees comply with applicable policies 100% of the time. (Doc. 36-1 at 45).

Plant equipment; he had no direct reports. (*See* Doc. 36-2 at 12; Doc. 36-21 at 16). Both Coughlin and Heather Doss, a Koch human resources ("H.R.") leader, described Ogle as Plaintiff's "peer" within the Koch organization. (Doc. 43 at 6). Plaintiff understood his job as Plant Manager required him to work effectively with other Plant personnel responsible for operations. (Doc. 36-2 at 11).

Plaintiff contends Coughlin treated him less favorably than Ogle and other white Koch employees. (Doc. 43 at 7). A Koch investigation partially substantiated an allegation that Coughlin did not trust Plaintiff and scrutinized his decisions while more readily accepting Ogle's suggestions and opinions. (Doc. 36-26 at 30). Given that Ogle's job influenced the Plant's design and processes, Plaintiff thought Ogle should report to him—not Coughlin. (Doc. 43 a 7). Plaintiff, a degreed engineer, found Coughlin's preferential treatment of Ogle particularly troubling because Ogle did not have an engineering degree. (*Id.*). When Plaintiff brought his concerns regarding Ogle to Coughlin, Coughlin labeled Plaintiff as exhibiting a victim mentality. (*Id.* at 18).[4]

In 2015 and 2016, Coughlin received negative feedback about Plaintiff's leadership. Charlie Troutman, who performed training at the Plant on multiple occasions, told Coughlin that Plaintiff was not engaged in the training, instead

---

[4] Plaintiff notes Coughlin initially chose Ogle over Plaintiff to attend leadership training in August 2016. (Doc. 43 at 8). However, it appears both Plaintiff and Ogle attended the training. (Doc. 36-22 at 20).

spending time on his phone. (*See* Doc. 35 at 6). In Spring 2016, Buddy Lewis, a director of EH&S, provided Coughlin with a rough transcript of an hour-long conversation during which Plaintiff complained about interference from Wichita. (*See id.*).

In September 2016, Deva Ratnabalasuriar, a maintenance manager at the Plant, presented a maintenance plan on which he and Plaintiff had worked. (Doc. 36-19; *see* Doc. 36-2 at 13).[5] Coughlin and Kimberly understood the maintenance plan as calling for hiring twelve new employees at a cost potentially ranging from hundreds of thousands to more than one million dollars. (*See* Doc. 35 at 7). Both Coughlin and Kimberly thought the proposal was excessive. (*See id.*). Additionally, the presentation did not meet Kimberly's or Coughlin's expectations because it did not use the Koch decision-making framework Plaintiff had been trained to use. (*See id.*). This damaged Plaintiff's credibility with Coughlin and Kimberly and caused them to question his business judgment; they believed the plan was too costly and that Plaintiff had not sufficiently explored the costs of the proposal or viable alternatives. (*See id.* at 7-8). Kimberly testified Plaintiff responded by blaming Wichita for not following the recommendation. (Doc. 36-32 at 23; *see* Doc. 35 at 8). Doss told Plaintiff he should have taken more ownership

---

[5] Ratnabalsuriar resigned from Koch in January 2017. (*See* Doc. 43 at 11). At some point prior to his resignation, Ratnabalsuriar asked Plaintiff for pay increases for his team. (*See id.* at 11-12). According to Koch, Plaintiff passed this request along to Wichita. (*Id.*). Wichita denied the request. (*Id.*).

for the proposal and provided more guidance for Ratnabalasuriar regarding its content. (*See* Doc. 35 at 8).

Plaintiff testified any solutions and the resources available to conduct preventative maintenance would need to be discussed by the group; he explained Ratnabalasuriar's recommendation was based on the data Koch provided regarding the amount of work needed to implement a preventative maintenance schedule. (Doc. 36-1 at 37; Doc. 36-2 at 16). According to Plaintiff, the presentation was intended to lay out the facts and start a discussion—not present a solution to staffing needs at the Plant. (Doc. 36-2 at 16). Plaintiff testified that Koch would have to either: (1) hire more employees to achieve the preventative maintenance goals it set; or (2) alter the preventative maintenance goals at the Plant. (*Id.*; Doc. 36-1 at 37). In either event, Plaintiff thought more discussion was needed. (Doc. 36-1 at 37; Doc. 36-2 at 16). Ultimately, Coughlin agreed additional employees were needed to conduct the proposed maintenance. (*See* Doc. 43 at 15).

Plaintiff testified the Plant was in a "reactive state" during his tenure as Plant Manager, meaning preventative maintenance was not performed. (Doc. 36-1 at 49-50, 52). Plaintiff also testified the Plant had "no preventative maintenance schedule, no real safety programs, [and] no real IT programs." (*Id.* at 62-63). Maximo is a computer-based maintenance management system designed to assist with preventative maintenance planning and budgeting; Coughlin and other Koch

leaders expected Plaintiff to implement Maximo at the Plant. (*See* Doc. 35 at 9).

Plaintiff opposed implementing Maximo and referred to it as a "sh** sandwich."

(Doc. 36-1 at 52-53; *see* Doc. 35 at 9). In April 2017, Tim Shanfelt, a Koch

employee involved in implementing Maximo, told Coughlin that working with

Plaintiff was "like pushing rope." (*See* Doc. 35 at 9). Coughlin interpreted this as

an expression of frustration with Plaintiff's lack of ownership at the Plant. (*See

id.*). Shanfelt also told Coughlin he had dispatched employees to the Plant to assist

in implementing Maximo but that Plaintiff did not use these employees—all the

while complaining about lacking resources. (*See id.*).

Plaintiff testified he found working with Ogle to be "degrading" because he

believed Coughlin accepted Ogle's opinions over his own. (Doc. 36-2 at 10). At

some point in 2017, Doss led a meeting between Coughlin, Ogle, and Plaintiff to

discuss their working relationship; during the meeting, Doss criticized Ogle and

Plaintiff for their inability to work together. (*Id.*; *see* Doc. 35 at 10). Plaintiff also

complained about Coughlin to Doss, but his complaints did not have a racial

component. (Doc. 36-2 at 10). In early 2017, Kimberly conducted several

coaching sessions with Plaintiff; Kimberly testified that during these sessions

Plaintiff blamed Wichita for difficulties at the Plant. (Doc. 36-32 at 20). Kimberly

opined Plaintiff's complaints limited the support capabilities Koch could provide at

the Plant. (*Id.*).

The Plant's air emissions are controlled by devices called "scrubbers." (Doc. 35 at 11). Late in 2016, a shift supervisor called Plaintiff to report concerns about one of the scrubbers and requested authority to shut it down. (*Id*.). Plaintiff instructed the shift supervisor to shut down the equipment. (*Id*.). After inspecting the scrubber and finding it was not dirty, the shift supervisor restarted the equipment. (Doc. 36-2 at 2). The Alabama Department of Environmental Management ("ADEM") regulates air emissions from the Plant and conducts annual inspections. (*See* Doc. 35 at 11). ADEM has the authority to issue citations, impose fines, and suspend or shut down operations at the Plant. (*See id.*). In the first half of 2017, an ADEM inspector visited the Plant to check logs recording scrubber flow rates. (*See id.*). According to Karyn Hetherington—the Plant's EH&S Manager and one of Plaintiff's direct reports—the flow rate data the Plant had gathered appeared to be inaccurate. (*See id.* at 12; Doc. 36-2 at 4). Accordingly, the accuracy of the data the Plant had produced to ADEM was in question. (Doc. 36-2 at 4). Plaintiff testified he did not remember whether he reviewed the flow rate data before providing it to ADEM; he also noted there was confusion regarding the data. (*Id.* at 5).

During an April 19, 2017 conversation, Plaintiff discussed the scrubber issue with Coughlin. (*See* Doc. 35 at 12). Koch contends this was the first time Plaintiff raised concern regarding the scrubber with either Coughlin or Ogle, despite having

discovered the issue months earlier.  (*Id.*).  However, Plaintiff testified he and Ogle indeed discussed the need to repair a fan and that he relayed this information to Coughlin.  (Doc. 43 at 16; Doc. 36-2 at 6).  In any event, Coughlin was disappointed and viewed the scrubber issue as an instance of Plaintiff's poor leadership, especially in light of Koch's expectations that employees ask questions, raise concerns, and seek guidance regarding compliance and ethical issues.  (*See* Doc. 35 at 12).  At this point, Coughlin developed reservations regarding Plaintiff's ability to successfully perform as Plant Manager.  (*See id.*).

Following the ADEM inspection, Hannah Valmont, Koch's Director of Compliance, led an investigation into the circumstances surrounding the scrubber. (Doc. 36-26 at 13-36; *see* Doc. 35 at 13; Doc. 43 at 12-14).  The investigation report noted Plaintiff did not remember: (1) the conversation during which he instructed the shift supervisor to shut down the scrubber; or (2) telling Coughlin about the scrubber issue.  (Doc. 36-26 at 20).[6]  Plaintiff testified he told Valmont: (1) he did not know whether the scrubbers were functioning properly; and (2) the Plant did not have accurate process and instrumentation diagrams or standard operating procedures.  (Doc. 36-2 at 5-6).  Valmont's investigation culminated with her recommendation that Plaintiff be removed as Plant Manager because, while he demonstrated some leadership ability, he did not have the skill to lead the

---

[6] Plaintiff later testified he did not remember the conversation with Coughlin at the time of Valmont's investigation.  (Doc. 36-2 at 3).

Plant through the challenges it faced. (Doc. 36-26 at 17). Valmont's investigation also substantiated the allegation that Plaintiff "had knowledge of the repairs or lack of repairs to key equipment required for permitted control device function" and did not take appropriate corrective steps. (*Id.* at 20). Valmont also concluded Ogle was not forthcoming during the investigation and recommended his termination. (*Id.* at 16). Kimberly subsequently conducted an informal follow-up investigation and concluded Ogle's teamwork and communications had improved following coaching from Coughlin. (*See* Doc. 36-32 at 15-16).

Plaintiff asked Coughlin for additional help at the Plant in Spring 2017. (Doc. 36-1 at 58). In response, Coughlin designated several of Plaintiff's colleagues, including Clint Buss and Cody Sprague, to support operations at the Plant. (*See* Doc. 35 at 14). Buss provided negative feedback to Coughlin and Kimberly regarding Plaintiff's "lack of leadership." (*See* Doc. 36-32 at 24; Doc. 36-33 at 4). Sprague, who visited the Plant to improve the EH&S performance, also told Plaintiff he had concerns about his leadership. (Doc. 36-1 at 59). Other Koch employees who assisted at the Plant in Spring 2017 described Plaintiff as a "complainer" and as having a victim mentality. (*See id.* at 58; Doc. 35 at 14). After this negative feedback, Plaintiff told Coughlin to not send additional Koch employees to the Plant. (Doc. 36-1 at 59-60). Plaintiff testified the employees Coughlin sent to the Plant in 2017 were not coming to help. (*Id.* at 58). Instead,

Plaintiff believed these employees were trying to collect evidence to support a narrative that he was failing as Plant Manager. (*Id.*). Additionally, Plaintiff testified Clint Buss violated a cardinal safety rule by reaching into an unlocked piece of equipment; Buss, who is white, was not disciplined. (*Id.* at 60).

Following Valmont's investigation, Coughlin created a "Sylacauga Turnaround Plan," which he circulated on May 18, 2017. (Doc. 36-20; *see* Doc. 35 at 15). The Sylacauga Turnaround Plan was intended to change the direction of the Plant's EH&S performance, which Coughlin opined was "going in the wrong direction." (*See* Doc. 35 at 16). The Sylacauga Turnaround Plan called for putting the Plant in "stand down" mode—meaning idling production—while conducting additional training on compliance issues. (*See id.* at 15; Doc. 36-2 at 17). During the stand down, Coughlin, Kimberly, and other Koch executives spoke with the Plant's personnel regarding the importance of safe work practices. (*See* Doc. 35 at 16).

On May 19, 2017, Kimberly told his boss—Josh Goodmanson, a senior vice-president—more aggressive action was required at the Plant; around this same time, Kimberly told Coughlin he believed Plaintiff should be terminated. (*See* Doc. 35 at 16; Doc. 36-32 at 21). Accordingly to Kimberly, the negative feedback from Koch personnel at the Plant was the final straw which caused him to lose faith in Plaintiff's leadership. (*See* Doc. 35 at 17). Also on May 19, 2017, Buddy

Lewis, Koch's Director of EH&S, questioned whether the Plant should be shut down due to serious safety risks. (*See id.* at 16; Doc. 36-41 at 2-4).

Throughout Plaintiff's tenure to this point, he received positive performance evaluations from Coughlin. (*See* Doc. 43 at 8-9). On November 1, 2016, Coughlin rated Plaintiff's performance as meeting expectations—a positive evaluation. (*See id.* at 8). In April 2017, Plaintiff's objective performance indicators were excellent. (*Id.*). On May 17, 2017, Coughlin wrote to Plaintiff that he believed the Plant would "thrive" under his leadership. (Doc. 36-28 at 40).

Plaintiff's problems with Ogle continued through May 2017. (*See* Doc. 43 at 9-10). Plaintiff viewed Ogle as detrimental to the culture at the Plant and thought he interfered with Koch's management philosophy. (*Id.* at 9). Buddy Lewis observed that Ogle would hoard information, stating he would not identify problems he foresaw, instead waiting to share his knowledge until asked a specific question. (*See id*. at 9). Another Koch employee reported his belief that Ogle hoped the Plant would fail so that he could become the Plant Manager. (*See id.*). Complaints regarding Ogle from these and other employees were forwarded to Doss, Kimberly, and Coughlin. (*See id.* at 10). H.R. did not investigate these complaints, and Coughlin saw them as an opportunity to coach Ogle. (*See id*. at 9).

Plaintiff testified Plant morale was low and he did not believe he could improve it. (Doc. 36-1 at 65). Sometime before mid-July 2017 both Doss and

Coughlin told Plaintiff they believed Plant personnel had a negative view of Koch leadership due to Plaintiff. (Doc. 36-2 at 7; *see* Doc. 35 at 15). In the Spring and Summer of 2017, Plaintiff told Coughlin he was unhappy working as Plant Manager—due to lack of support from Coughlin—and did not know if he wanted to continue in that position. (Doc. 36-2 at 18-19). Coughlin told Plaintiff he would explore options for a severance package. (*Id.*). Around June 1, 2017, Coughlin decided to terminate Plaintiff. (*See* Doc. 35 at 17; Doc. 43 at 10). Coughlin based his decision on his own observations and the negative feedback regarding Plaintiff he had received from other Koch employees. (*See* Doc. 35 at 17). Coughlin asked Kimberly whether Plaintiff could be reassigned to a non-managerial role, but no positions were available. (Doc. 36-32 at 18).

On July 5, 2017, ADEM issued a warning letter to the Plant based on the inspection earlier in the year. (*See* Doc. 35 at 18; Doc. 36-2 at 5). In early July 2017, Coughlin developed a plan to manage the Plant while removing Plaintiff and training a new Plant Manager. (*See* Doc. 35 at 18). Coughlin spoke with Kimberly, Doss, and Goodmanson regarding his decision to terminate Plaintiff; each supported the decision. (*See id.*; Doc. 43 at 10). Coughlin wanted to meet Plaintiff in person to discuss the termination and held the meeting on July 12, 2017, in Wichita, where Plaintiff was attending training. Doss also attended the meeting. (*See* Doc. 35 at 19; Doc. 43 at 10). Coughlin told Plaintiff things had not

been going well at the Plant and said he had a victim mentality. (Doc. 36-2 at 19).

Coughlin later explained he used the term "victim mentality" to describe Plaintiff's

failure to take ownership of unfavorable results. (*See* Doc. 35 at 19). Coughlin

concluded the meeting by offering a severance package, the terms of which

depended on how long Plaintiff continued working. (Doc. 36-2 at 19-20). Plaintiff

rejected the severance package; his employment with Koch ended that day. (*Id.*;

*see* Doc. 35 at 19). Ogle applied for the Plant Manager position but was not hired

in that capacity. (Doc. 35 at 19).[7] In August 2017, Coughlin hired Jeff Bird, who

is white, to replace Plaintiff as Plant Manager. (*Id.* at 20; *see* Doc. 43 at 14).

During all relevant times, Plaintiff was Koch's only African American Plant

Manager. (*See* Doc. 43 at 6). Additionally: (1) the upper management of Koch's

facilities was devoid of African Americans; and (2) Coughlin never worked with

any other African Americans in upper management positions. (*Id.*). Among all of

Coughlin's direct reports, Plaintiff was one of only three African Americans;

Coughlin either terminated or was involved in terminating each. (*Id.*). The three

vacant positions were filled by white employees. (*Id.*). Coughlin once said to

Plaintiff in reference to President Obama, "I guess because we had to vote for a

black guy, I guess we have got to vote for a woman now." (*Id.*). At some point

---

[7] Instead, on September 24, 2017, Ogle was hired as an engineering leader, a position in which he had two direct reports. (*See* Doc. 35 at 19). Ogle resigned from Koch on December 2, 2017. (*See id.*).

Coughlin also told Plaintiff President Obama was "the most racist president in history." (*Id*.). Meanwhile, in 2015, Coughlin fired the Plant's newly hired EH&S manager for using the "N-word" to refer to Native Americans and for making other racially insensitive remarks. (*See* Doc. 35 at 20; Doc. 36-1 at 38).

Koch's response to Plaintiff's EEOC complaint cited a number of reasons behind the termination decision: (1) the resignation of Ratnabalasuriar; (2) Plaintiff's action of simply forwarding Ratnabalasuriar's request for increased pay to Wichita, and blaming Wichita when the request was denied; (3) passing on an inquiry regarding employee discipline to H.R.; and (4) the results of the internal investigation following ADEM's warning letter regarding air emissions data. (*See* Doc. 43 at 10-13). In response to discovery in this case, Koch incorporated the positions from its EEOC response. (*See id.* at 20-21).

## III.  DISCUSSION

Plaintiff's claim for racial discrimination, which is based on circumstantial evidence, is analyzed under the familiar *McDonnell Douglas* burden-shifting framework. After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *E.g. Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly

light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Chapman v. AI Transp.,* 229 F.3d 1012, 1025 (11th Cir. 2000). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Id.* at 1030. To demonstrate pretext, the plaintiff must show the proffered reason was false and that discrimination was the real reason for the employer's action. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Here, even if Plaintiff can satisfy his *prima facie* case because his replacement as Plant Manager was white, he cannot show Koch's proffered reasons for his termination were pretext for invidious discrimination. Koch has offered a legitimate, nondiscriminatory reason for terminating Plaintiff: poor leadership. Plaintiff contends Koch's proffered rationale is pretextual due to: (1) comparisons to Koch's treatment of Ogle; (2) positive employment evaluations preceding termination; (3) inconsistencies between Koch's proffered reasons for

termination; and (4) Coughlin's statements regarding President Obama, together with his pattern of terminating African American managers. (Doc. 43 at 19-34). Each argument is addressed in turn.

### A.    <u>Ogle is Not a Suitable Comparator</u>

In order to show pretext through comparator evidence, a plaintiff must point to a comparator who is "similarly situated in all material respects." *Lewis v. City of Union City, Ga.,* 918 F.3d 1213, 1218 (11th Cir. 2019). To be similarly situated, a proposed comparator generally must have: (1) engaged in the same basic conduct as the plaintiff; (2) been subject to the same employment policy; (3) been under the same supervisor; and (4) have the same employment and disciplinary history. *Id.* at 1227-28. Here, Ogle and Plaintiff were subject to the same employment policy and reported to the same supervisor. However, Ogle does not satisfy the other requirements articulated in *Lewis*.

First, Ogle and Plaintiff occupied different positions with different responsibilities. As Plant Manager, Plaintiff led the entire Plant, supervising five direct reports, sixty to seventy employees, and ten to fifteen contractors. Koch's principal expectations for Plaintiff as the Plant Manager focused on demonstration of leadership, and Plaintiff's three main responsibilities were: (1) coaching his team and helping them fulfill the Plant's mission; (2) transitioning EH&S practices to comply with Koch's standards and to ensure equipment was reliable; and (3)

creating a five-year business plan setting goals for the Plant's operations, sales, safety, quality, and financial performance. Conversely, Ogle had no direct reports, and his primary responsibility was project management at the Plant. Unlike Plaintiff, Ogle did not have an engineering degree. Despite Coughlin's and Doss's references to Ogle as Plaintiff's peer, the dissimilarities between their positions and responsibilities at the Plant makes Ogle an unsuitable comparator.

As to conduct, Plaintiff notes: (1) Valmont's investigation recommended terminating both Ogle and Plaintiff; and (2) other Koch employees complained about Ogle's work practices. Both Valmont's investigation and the other employees' complaints concerned different types of misconduct by Ogle and Plaintiff. As to Valmont's investigation, it found: (1) Plaintiff failed to take appropriate steps to correct known problems with the scrubber and recommended his termination due to insufficient leadership skills; and (2) Ogle was not forthcoming during the investigation and should be terminated. As to complaints by other Koch employees regarding Ogle: (1) Buddy Lewis opined he hoarded information; and (2) one employee theorized Ogle wanted the Plant to fail so he could become Plant Manager. Meanwhile, complaints concerning Plaintiff focused on his poor leadership at the Plant. Additionally, Koch has presented unrebutted evidence that, after coaching from Kimberly, Ogle's performance improved;

Plaintiff does not point to any evidence in the record showing improvement in his performance.

For the foregoing reasons, Ogle and Plaintiff are not similarly situated in all material respects. Accordingly, Ogle is not a useful comparator, and differences in his treatment are not probative of pretext.[8]

### B. Positive Employment Evaluations Fail to Show Pretext

Next, Plaintiff relies on positive feedback and performance evaluations to show pretext. (Doc. 43 at 8-9, 26). Specifically, Plaintiff points to: (1) positive feedback from Buddy Lewis in July 2016; (2) a November 1, 2016 performance evaluation in which Coughlin rated Plaintiff as meeting expectations; (3) excellent performance indicators in April 2017; and (4) the May 17, 2017 email in which Coughlin told Plaintiff the Plant could thrive under Plaintiff's leadership.

Of this positive feedback, only Coughlin's May 17, 2017 email occurred after the revelations surrounding the ADEM incident, Valmont's investigation, and Coughlin's creation of the Sylacauga Turnaround Plan. Two days later, on May 19, 2017, Lewis and Kimberly discussed whether the Plant should be shutdown entirely, and Kimberly told Coughlin he thought Plaintiff should be terminated. Subsequently: (1) Plaintiff told Coughlin he was unsure whether he wanted to

---

[8] Plaintiff's response also asserts Coughlin treated him differently than Kevin Lamble, another white Koch employee. (Doc. 43 at 7). Lamble was the Plant Manager at Koch's St. Louis facility. (*See* Doc. 45 at 6, n.2). However, Plaintiff does not point to other evidence regarding Lamble's suitability as a comparator. (*See* Doc. 36-2 at 27).

continue as Plant Manager; and (2) ADEM issued the warning letter regarding the emissions data.

Under these circumstances, the prior positive feedback and performance evaluations Plaintiff received do not show pretext. *See Walker v. St. Joseph's/Candler Health Sys., Inc.,* 506 F. A'ppx 886, 890 (11th Cir. 2013) (positive review prior to events giving rise to adverse employment action did not show pretext); *Dingman v. Delta Health Group, Inc.*, 26 F. Supp. 2d 1349, 1353 (S.D. Fla. 1998) (positive evaluations predating problems which led to termination not necessarily probative of pretext). Moreover, the court does not sit as a "super-personnel department," second-guessing whether Plaintiff's termination was justified. *Alvarez v. Royal Atl. Devs. Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Here, unrebutted evidence shows the positive feedback regarding Plaintiff predated Coughlin's conclusion that he should be terminated as Plant Manager. Accordingly, the earlier positive feedback does not show pretext.

## C. <u>Koch's Proffered Reasons for Termination are Not Inconsistent</u>

Plaintiff contends the rationale for termination which Koch articulated to the EEOC is inconsistent with the reasons Koch now offers to the court. (Doc. 43 at 20-31). However, Koch's EEOC position statement clearly states "Koch's decision to terminate Willis's employment was based entirely on his failure to fulfill his leadership responsibility in his role as Plant Manager." (Doc. 36-26 at

5). This rationale—failed leadership—is precisely the same reason Koch has offered to the court in this matter. (Doc. 35 at 2) ("Defendant terminated Plaintiff's employment because Plaintiff failed to fulfill his responsibilities— namely, by demonstrating a lack of leadership."). It is true that Koch's EEOC position statement provided different examples of Plaintiff's lack of leadership than offered here on summary judgment. However, this is insufficient to show pretext. *Kretzschmar v. Birmingham Nursing & Rehab. Ctr. E., LLC,* No. 14-2207-JEO, 2017 WL 2212705 at *17 (N.D. Ala. May 19, 2017) (no pretext where defendant offered evidence to the court regarding grounds for termination not included in its EEOC position statement); *Thomkins v. Cuts By Us., Inc.,* No. 17-1679-AKK, 2019 WL 3387775 at *9 (N.D. Ala. July 26, 2019) (no pretext shown by offering court examples of plaintiff's deficient leadership which were not presented to the EEOC).

Coughlin testified that when he decided to terminate Plaintiff, he either did not know about, or did not rely on, the conduct described in Koch's EEOC position statement. (*See* Doc. 43 at 21-25). However, unrebutted evidence shows Doss: (1) was also involved in the decision to terminate Plaintiff; (2) was aware of events described in the EEOC position statement; and (3) based her opinion of Plaintiff's poor leadership on her own observations, as well as Coughlin's. (*See* Doc. 45 at 13-14; Doc. 36-30 at 8, 14-15, 22-25, 32). Moreover, nothing in Koch's EEOC

position statement is inconsistent with a theory of poor leadership. *See Moore v. Jefferson Cty. Dep't of Hum. Res.*, 277 F. A'ppx 857, 860 (11th Cir. 2008) (differences between reasons for adverse employment action offered to EEOC failed to show pretext where the reasons were not inconsistent); *Kretzschmar*, 2017 WL 2212705 at *16 ("Evidence that an employer has additional reasons for a challenged employment decision beyond those asserted in its position statement does not show pretext unless the reasons are inconsistent.").

Plaintiff also points to a factual dispute regarding the scrubber. Koch contends Plaintiff knew about the faulty scrubber months before the ADEM inspection but failed to inform Ogle or Coughlin. Plaintiff contends he told both Ogle and Coughlin about the issue, pointing to his testimony concerning a fan that did not run. (Doc. 43 at 27). Even resolving this factual dispute in Plaintiff's favor does not establish pretext, especially in light of the unrebutted evidence regarding: (1) Plaintiff's admitted inability to improve low morale at the Plant; (2) the ADEM warning letter received on Plaintiff's watch; (3) Plaintiff's testimony that the Plant did not have a comprehensive safety program; (4) Coughlin's creation of the Sylacauga Turnaround Plan to address EH&S problems at the Plant; (5) Plaintiff's statements to Coughlin during the months preceding his termination that he was unhappy and did not know if he wanted to continue working as Plant Manager; (6) complaints from numerous colleagues and superiors regarding Plaintiff's lack of

leadership and tendency to blame problems on Wichita; and (7) Koch's contemplation of shutting down the Plant to address unsafe work practices.

For the foregoing reasons, the differences between the conduct described in Koch's EEOC position statement and its briefing here are not inconsistent. Accordingly, any such differences are not probative of pretext.

### D.    Coughlin's Statements and Terminations Do Not Show Pretext

Next, Plaintiff contends a jury could infer race discrimination based on Coughlin's past termination decisions regarding other Koch employees, together with two comments he made regarding President Obama.  (Doc. 43 at 33-34). Regarding the past terminations, Plaintiff notes: (1) he was the only African American Plant Manager and the only one with whom Coughlin had ever worked; and (2) among Coughlin's direct reports, Charlie Sanders and Bobbie Jones were the only other African Americans.  (*Id.* at 33).  Plaintiff further alleges "Coughlin terminated or was involved in terminating each of them and replacing them with white employees."  (*Id.*).  The unrebutted evidence shows that, while Coughlin discussed the termination decision regarding Bobbie Jones with Kevin Lamble, Lamble ultimately made the decision to terminate Jones.  (*See* Doc. 45 at 9-10; Doc. 36-21 at 26).  Coughlin did make the decision to terminate Charlie Sanders, but his termination decision was based on Sanders's failure to report an allegation that a Koch employee had raped a co-worker at a Koch facility.  (*See* Doc. 45 at 9-

10; Doc. 36-21 at 25).  The different circumstances surrounding the terminations of Plaintiff and Sanders limit their usefulness in determining pretext here.

Additionally, the contention that Coughlin exhibited a pattern of racially discriminatory terminations is undermined by his reasons for firing white Koch employees, including: (1) Everett Borg, an EH&S manager at the Plant, for making racially derogatory statements; and (2) Steve Crader, the Plant Manager for Koch's St. Louis facility, for lack of leadership.  (*See* Doc. 45 at 10; Doc. 36-21 at 54). Accordingly, the evidence does not support Plaintiff's theory that Coughlin exhibited a pattern of race-based terminations

As to Coughlin's racially-motivated statements, Plaintiff alleges Coughlin— presumably at some point in 2016—said, "I guess because we had to vote for a black guy, I guess we have got to vote for a woman now."  At another unknown point in time, Coughlin said President Obama was "the most racist president in history."  These two comments by Coughlin are the only race-based statements on which Plaintiff relies.  Moreover, Plaintiff does not allege these comments were in any way connected to the decision to terminate him.  Stray comments by a supervisor which are not related to the termination decision are insufficient to show pretext absent other evidence.  *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) (pretext not established by supervisor's statement, "We'll burn his black ass"); *see also Addison v. Ingles Mkts., Inc.,* No.

11-0003, 2012 WL 3600844 at *14 (M.D. Ga. Aug. 21, 2012) (no pretext where manager made derogatory comments about President Obama and asked why one department employed so many African Americans). Accordingly, Coughlin's statements concerning President Obama are insufficient to show pretext.

## IV.    CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact, and Koch is entitled to judgment as a matter of law. Accordingly, Koch's motion for summary judgment is due to be granted in its entirety, and Plaintiff's claims are due to be dismissed with prejudice. (Doc. 34). In light of this conclusion, the other pending motions are due to be denied as moot. (Docs. 25, 30, 31, 42). A separate order will be entered.

**DONE** this 25th day of March, 2020.


STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE